# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURA STEWART, et al | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JEREMY MOLL, et al | : | No. 07-1085 |

## MEMORANDUM OPINION

**Goldberg, J.**                                                                                                                                        May 10, 2010

This case stems from the shooting death of James Stewart, who was killed after resisting Allentown Police Officers' attempts to take him into custody. Currently before the Court is Defendants' Motion for Summary Judgment, which seeks the dismissal of Plaintiffs' § 1983 and state law claims brought against the City of Allentown and two individual police officers. Because we find that genuine issues of material fact remain as to whether the shooting officer, Jeremy Moll, used excessive force, Defendants' motion to dismiss that particular § 1983 claim will be denied. However, for reasons detailed below, the bulk of Plaintiffs' other civil claims will be dismissed.

## I. FACTUAL BACKGROUND

James Stewart (hereinafter referred to as "the decedent") had been incarcerated in Northampton County, Pennsylvania, in a work release program. On March 4, 2005, the decedent left that program without permission and returned to his former residence at 510 Auburn Street, Allentown, Pennsylvania. On March 19, 2005, the Allentown Police Department was informed that the decedent was staying at this residence. On the same day, Officers Jeremy Moll and Wesley Wilcox proceeded to the residence, and upon their arrival, they encountered the decedent's sister,

1

Tonya Stewart. When the officers asked Stewart if the decedent was present, she replied that he was not home. The officers then requested permission to enter and search the premises, to which Stewart agreed. Upon entering the residence, the officers found the decedent sitting on a bed in the bedroom. After confirming the decedent's identity based on the tattoos on his neck and arm, the officers asked the decedent to stand up and place his hands behind his back. (Statements of Undisputed Facts, ¶¶ 3-35).

According to Tonya Stewart's deposition testimony, the following occurred next:

After the officers told the decedent to stand and put his hands behind his back, the decedent took a box cutter from his belt and began stabbing himself in the chest. Officer Wilcox then began wrestling with the decedent and the box cutter "went flying across the room . . . totally across the room." Meanwhile, Officer Moll, who was not immediately involved in the struggle, tripped over something in the room. After losing the box cutter, the decedent began "running towards the door," while still engaged with Wilcox, who stood between the decedent and the door and held one of his arms. The decedent was able to free his arm from Wilcox and the now free arm fell to his side. Officer Moll, now back on his feet, then shot the decedent, who fell to his knees, after which Moll shot him again, causing the decedent to fall backwards. According to Tonya Stewart, the shots happened in quick succession. (Stewart Dep., pp. 52-54, 57, 59, 64, 77).

Stewart further testified that after the shots were fired, Wilcox said to Moll, "[w]hat the F' did you do?," and Moll responded "I don't know; I don't know." Tonya Stewart was screaming, "[y]ou shot my brother" and Moll next "threw [Tonya Stewart] to the ground" and told her to put her hands behind her back. Moll stated, "[the decedent] just had an F'in knife . . . I don't know if you have any weapons." In the meantime, Wilcox handcuffed the decedent. (Stewart Dep., pp. 77-

78, 82).

Tonya Stewart has further alleged that Moll put handcuffs on her that were so tight she had marks on her hands. She further stated that sometime after the shooting, Wilcox picked up the box cutter and "threw it by [the decedent]." She was eventually taken to the police station where she was questioned about the incident. (Stewart Dep., pp. 78, 85, 88-89).

Tonya Stewart's version of the shooting recounted above, differs from statements she made following the incident. Most notably, according to the police report, Stewart stated that the decedent "was fighting the cops with a knife: he was crazy, he just kept going, until they shot him." (Police Report, p. 4).

The officers' account of the shooting also varies from Tonya Stewart's recollection. According to the officers, the following occurred:

When the officers asked the decedent to stand up and place his hands behind his back, he refused to comply. Wilcox then grabbed the decedent's right elbow, and the decedent began reaching for his waist area. Moll then grabbed the decedent's left arm, and the officers wrestled with him. At this point, Wilcox saw a knife in the decedent's hand, and the knife fell during their struggle. The decedent began reaching for the knife, broke free from Moll, and began pushing Wilcox, causing Wilcox to fall over the bed and lose his grip on the decedent. When the decedent moved towards Wilcox, Moll fired two shots. Before the shots, Wilcox could not see the decedent's left hand but indicated that there may have been a knife in that hand. Moll stated that he saw a "gray metallic object," which he thought was a knife, in the decedent's right hand when he shot. (Statements of Undisputed Facts, ¶¶ 70-105).

Plaintiffs, Laura Stewart, the Administratrix of the estate of the decedent, and Tonya Stewart,

filed suit on March 19, 2007, against the City of Allentown, Allentown Police Chief Joseph Blackburn, and Officers Moll and Wilcox. The complaint generally alleges § 1983 claims and also raises numerous state law causes of action.[1]

Defendants subsequently filed a motion to dismiss, and on July 9, 2007, the Honorable James Knoll Gardner granted that motion as unopposed and dismissed Counts I, II, III, X, and XV. On August 16, 2007, Plaintiffs' claims against Blackburn were dismissed for failure to serve the summons and complaint. On April 20, 2010, Defendants filed the instant motion for summary judgment seeking the dismissal of Plaintiffs' remaining claims.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Brooks v. CBS Radio, Inc., 342 Fed.Appx. 771, 775 (3d Cir. 2009) (citing Fed. R. Civ. P. 56(c)). "In determining whether the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the facts must be viewed, and all reasonable inferences must be drawn, in the light most favorable to the non-moving party."

---

[1] These causes of action are: Section 1983 claim (Count I); Survival Action claim under § 1983 by the estate against all the defendants (Count II); Wrongful Death claim under § 1983 by the estate against all the defendants (Count III); Excessive Force under § 1983 by the estate and Tonya Stewart against the individual defendants (Count IV); Unlawful Seizure under § 1983 by Tonya Stewart against the individual defendants (Count V); False Imprisonment under § 1983 by Tonya Stewart against the individual defendants (Count VI); Denial of Medical Care under § 1983 by the estate against the individual defendants (Count VII); Civil Conspiracy under § 1983 by the estate and Tonya Stewart against the individual defendants (Count VIII); Municipal Liability under § 1983 by the estate and Tonya Stewart against the City of Allentown (Count IX); State Constitutional Violations (Count X); Assault and Battery by the estate against the individual defendants (Count XI); False Arrest and Illegal Imprisonment by Tonya Stewart against the individual defendants (Count XII); Civil Conspiracy by the estate and Tonya Stewart against the individual defendants (Count XIII); Intentional Infliction of Emotional Distress by the estate and Tonya Stewart against the officers (Count XIV); and Negligent Infliction of Emotional Distress by the estate and Tonya Stewart against the officers (Count XV).

Id. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). The Court's function in deciding a motion for summary judgment is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. Id. at 248-249.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

### B. Excessive Force Under 42 U.S.C. § 1983 (Count IV)

Plaintiffs have raised several claims of excessive force under § 1983: the estate's claim against Moll for shooting the decedent; the estate's claim against Wilcox for failing to intervene in the shooting; Tonya Stewart's claim against Moll for throwing her to the ground after the shooting; and Tonya Stewart's claim against Wilcox for failing to intervene when Moll threw her to the ground. We address each claim below.

#### (1) The Estate's Excessive Force Claim Against Moll

To determine whether Moll used excessive force, the inquiry is whether his actions were

5

objectively reasonable in light of the facts and circumstances with which Defendants were confronted. Graham v. Connor, 490 U.S. 386, 397 (1989). The use of force should be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary." Id. at 396-97. In considering the unique facts and circumstances of each case, the Court should consider: the severity of the crime at issue; whether the suspect posed an immediate threat to the safety of the officers or others; and whether he was actively resisting arrest or attempting to evade arrest by flight. Id. at 396. The Third Circuit has provided additional factors to consider, including the possibility that persons subject to police action are themselves violent or dangerous, the duration of the action, whether the action took place in the context of effecting an arrest, the possibility that the suspect may have been armed, and the number of persons with whom the police officers had to contend with at one time. Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

A police officer may not use deadly force to effectuate the arrest of all fleeing felons. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Tennessee v. Garner, 471 U.S. 1, 11 (1985). If the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape with deadly force. Id. at 11-12.

Here, viewing the facts in the light most favorable to the estate, a jury could conclude that the decedent was shot when he was unarmed and attempting to the flee the room. While the factual record reflects that the decedent possessed a box cutter at one point and had attempted to stab

himself in the chest, Tonya Stewart stated that, "[a]t no point was [the decedent] doing anything towards anyone else; he was just stabbing himself . . . they somehow wrestled him to get it away from him." Stewart also indicated that during the ensuing scuffle, the box cutter went "flying across the room."   (Stewart Dep., pp. 47, 57). Thus, under these facts, the decedent was shot while unarmed. Accordingly, we find that there remains a genuine issue of material fact as to whether Moll's use of deadly force was justified.

Moll also contends that he is immune from the estate's excessive force claim pursuant to the doctrine of qualified immunity. This doctrine exists to protect government officials exercising good faith in their discretionary duties from the unreasonable burdens of trial. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Boria v. Bowers, 2009 WL 902421, at *7 (E.D. Pa. Mar. 31, 2009).[2] The court is encouraged to address the issue of qualified immunity at the earliest possible stage in the proceedings, as the privilege is "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 129 S.Ct. 808, 818 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). However, ruling on qualified immunity at an early stage is often not practical because "the importance of resolving qualified immunity questions early 'is in tension with the reality that factual disputes often need to be resolved before determining whether Defendant's conduct violated a clearly established constitutional right.'" Phillips v. County of Allegheny, 515 F.3d 224, 242 n.7 (3d Cir. 2008) (citing Curley v. Klem, 298 F.3d 271, 277-278 (3d Cir. 2002)).

When analyzing qualified immunity, it is clear that the normal principles of summary

---

[2] The Supreme Court has constructed a two-step test for determining whether a defendant is entitled to qualified immunity. First, the court is tasked with determining whether the facts alleged show the officer's conduct violated a constitutional right. Second, assuming such a violation is found, the court must analyze whether the right that was violated was a clearly established right. See Saucier v. Katz, 533 U.S. 194, 201-202 (2001). Although the Supreme Court has since relaxed this rigid two-step test, the Saucier method of analysis may still be used when appropriate. See Pearson v. Callahan, 129 S.Ct. 808, 818 (2009).

judgment apply, thus rendering it "inappropriate to grant summary judgment if there are material factual disputes as to whether a constitutional violation has occurred or whether the constitutional right is clearly established." Boria, 2009 WL 902421, at *8 (citing Curley v. Klem, 499 F.3d 199, 208 (3d Cir. 2007)). As outlined above, we find that there are genuine issues of material fact as to whether Moll used excessive force when he shot the decedent. We, therefore, decline to grant summary judgment based upon qualified immunity.

### (2) Tonya Stewart's Excessive Force Claim Against Moll

As stated above, the proper inquiry in evaluating Stewart's excessive force claim against Moll is whether the officer's actions were objectively reasonable in light of the facts and circumstances. Graham, 490 U.S. at 397. Stewart's excessive force claim will be dismissed because even viewing the facts in a light favorable to Stewart, Plaintiffs have not provided evidence that Moll acted unreasonably under the circumstances.

In short, Moll's actions of throwing Tonya Stewart to the ground and then handcuffing her, even where the cuffs were tight, was not excessive force under the circumstances. We note that the undisputed facts reflect that: (1) Tonya Stewart had already committed a crime by lying to police about the whereabouts of her fugitive brother; (2) when the police found the decedent, he was initially armed and resisted arrest; (3) after Moll threw Tonya Stewart to the ground, he stated he did not know if she was armed; and (4) Tonya Stewart suffered no physical injuries from the incident, except for marks on her hands from the handcuffs. Two recent cases support our conclusion that there are no material facts for a jury to consider regarding the force used against Stewart.

First, in Creveling v. Columbia County, 2008 WL 1826907, at *5 (M.D. Pa. Apr. 22, 2008), the plaintiff claimed that police, when executing an arrest warrant of a third person, broke down a

8

door, tackled plaintiff, who was sitting down and not resisting, put his face in the carpet and handcuffed him. Under these facts, the court found that the police did not use excessive force because plaintiff did not suffer any injuries except for soreness from the handcuffs. Id. In Steele v. District of Columbia Housing Authority, 2006 WL 335770, at *7 (D.D.C. Feb. 14, 2006), the plaintiff claimed that police grabbed him, twisted him around and slammed him up against a wall. The court concluded that these facts were also not sufficient to create a factual issue as to whether the police used excessive force because the police used a typical maneuver in an arrest situation. This was especially the case where plaintiff had been previously accused of violence and where plaintiff suffered no significant physical injury. Id. at *7-*8.

### (3) The Estate and Tonya Stewart's Claims of Excessive Force Against Wilcox

With regards to Wilcox, we also find that Plaintiffs have not presented any facts to support their failure to intervene claims. "Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if that excessive force is employed by a superior." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). An officer is directly liable under § 1983 if that officer, "whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981). However, "an officer is only liable if there is a realistic and reasonable opportunity to intervene." Smith, 293 F.3d at 651 (citing Clark, 783 F.2d at 1007; Putman, 639 F.2d at 423-424).

Here, even accepting Tanya Stewart's version of the events, Wilcox was not presented with any opportunity to intervene. As to the shooting, the undisputed facts reflect that Wilcox was physically engaged with the decedent and trying to prevent him from leaving the bedroom. When

9

the decedent escaped Wilcox's grip, he was shot twice in rapid succession. Given the quick sequence of events, as described by Tonya Stewart, Wilcox simply did not have any opportunity to intervene, a point all but conceded by Plaintiffs. (Plaintiffs' Resp., p. 15).

Further, because we have already found that Moll did not use excessive force when he threw Tonya Stewart to the ground, Wilcox cannot be liable for the failure to intervene in this incident. However, even if Moll had used excessive force, we would find that Wilcox did not have an opportunity to intervene. According to Tonya Stewart's own account, Wilcox was handcuffing the decedent at the same time that Moll threw her to the ground and handcuffed her. (Tonya Stewart Dep., pp. 82-83). Therefore Plaintiffs' excessive force claims against Wilcox shall be dismissed.

### C. Tonya Stewart's Unlawful Seizure and False Imprisonment Claim Under § 1983 (Counts V and VI)

Tonya Stewart's claims for unlawful seizure and false imprisonment under § 1983 will also be dismissed because the undisputed facts reflect that the officers had probable cause to arrest her. Section 1983 claims for false arrest and false imprisonment are based on the Fourth Amendment guarantee against unreasonable seizure. To make out a false arrest claim, "a plaintiff must show that the arresting officer lacked probable cause to make the arrest." Garcia v. County of Bucks, 155 F.Supp.2d 259, 265 (E.D. Pa. 2001) (citing Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995)). There may be a claim under § 1983 for false imprisonment only where the police lack probable cause to make an arrest. Groman, 47 F.3d at 636. "Probable cause exists when the totality of facts and circumstances are sufficient to warrant an ordinary prudent officer to believe that the party charged has committed an offense." Garcia, 155 F.Supp.2d at 265.

Here, the officers had probable cause to arrest Tonya Stewart for the crime of hindering

apprehension. Under Pennsylvania law, the crime of hindering apprehension is defined as:

> A person commits an offense if, with the intent to hinder the apprehension, prosecution, conviction or punishment of another for crime or violation of the terms of probation, parole, intermediate punishment or Accelerate Rehabilitative Disposition, he:
> (1) harbors or conceals the other . . . or
> (5) provides false information to a law enforcement officer.

18 Pa. C.S. § 5105(a). In her deposition, Tonya Stewart admitted to lying to the officers about the decedent's whereabouts when they arrived at 510 Auburn Street. She also acknowledged that she became aware that the decedent had walked away from work release when the police arrived at the residence. (Stewart Dep., pp. 40, 45). The officers then encountered the decedent, after which Tonya Stewart was taken into custody.[3] Considering these facts, we find that there is no genuine issue of material fact, and the officers possessed probable cause to believe that Tonya Stewart had committed the offense of hindering apprehension.[4]

### D. The Estate's Denial of Medical Care Claim Under § 1983 (Count VII)

The Estate's claim of denial of medical care must also be dismissed. To prevail on a claim for the failure to provide medical care under § 1983, a plaintiff must show a deliberate indifference to serious medical needs. Groman, 47 F.3d at 637. Plaintiffs have failed to provide any evidence that officers Moll and Wilcox were deliberately indifferent to the decedent's medical needs. In fact, they have not even addressed this count in their response. By Tonya Stewart's own account, after she and the decedent were handcuffed, Wilcox called dispatch, and a medical team arrived shortly thereafter. (Stewart Dep., pp. 79-80). As there are no genuine issues of material fact as to this claim,

---

[3] Defendants argue that Tonya Stewart was never actually arrested. We need not reach this issue, however, because the officers clearly had probable cause to arrest her if they wished.

[4] Tonya Stewart argues that the officers never stated, either at the scene or thereafter, that she was taken into custody for hindering apprehension. We find this argument unpersuasive because no matter their stated reasons, the officers had probable cause to arrest Tonya Stewart.

Count VII will be dismissed.

### E. Tonya Stewart's Civil Conspiracy Claim Under § 1983 (Count VIII)

Plaintiffs' claim that Wilcox and Moll conspired to deprive them of their constitutional rights will also be dismissed. To sustain a conspiracy claim under § 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law." Royster v. Beard, 308 Fed.Appx. 576, 579 (3d Cir. 2009) (quoting Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 700 (3d Cir. 1993). "Circumstantial evidence may provide adequate proof of conspiracy," and a jury may "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding." Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979).

In support of their claim, Plaintiffs cite the following facts: (1) the shooting of the decedent; (2) the handcuffing of the decedent as he was dying; (3) the throwing of Tonya Stewart to the ground next to her brother; and (4) the treatment of Tonya Stewart after the shooting, including preventing her from accompanying her brother to the hospital, questioning her after the incident, and refusing to allow her to talk to her mother or take her medication. (Plaintiffs' Resp., pp. 27-28). While some of these facts may, if accepted, evidence constitutional violations, they in no way establish an agreement or mutual understanding between the officers. Therefore, Count VIII shall be dismissed.

### F. Tonya Stewart and the Estate's Municipal Liability Claim Under § 1983 (Count IX)

Plaintiffs' municipal liability claim against the City of Allentown will also be dismissed. Municipalities and other government bodies may be sued under § 1983 for constitutional rights violations. Monell v. Dep't of Soc. Servcs. of City of New York, 436 U.S. 658, 690-692 (1978).

To prevail on a Monell claim, a plaintiff must establish that: (1) the municipality had a policy[5] or custom[6] that deprived him of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) his injury was caused by the identified policy or custom. Pelzer v. City of Philadelphia, 656 F.Supp.2d 517, 531 (E.D. Pa. 2009) (citing Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403-404 (U.S. 1997)).

Liability may not be imposed solely on a respondeat superior theory. Monell, 436 U.S. at 692. The plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation. Watson v. Abington Twp., 478 F.3d 144, 155-156 (3d Cir. 2007). Proof of the existence of an unlawful policy or custom is not enough to maintain a § 1983 action. A plaintiff must additionally prove that the municipal practice proximately caused the injuries suffered. Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984). To establish causation, "there must be an affirmative link between the policy and the particular constitutional violation alleged." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).

Here, Plaintiffs contend that the City of Allentown "created an 'organizational atmosphere' that condoned unconstitutional, reckless and dangerous behavior by individual officers." (Plaintiffs' Resp., p. 10). Courts have adopted a "deliberate indifference standard" in similar cases of municipal liability. See Beck v. City of Pittsburgh, 89 F.3d 966, 972-973 (3d Cir. 1996) (applying the

---

[5] A "[p]olicy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

[6] A "[c]ustom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).

13

deliberate indifference standard where the plaintiff alleged that the city had a custom of condoning excessive force). "[T]o survive summary judgment under this standard, the plaintiff must produce facts tending to show the City knew of a pattern of constitutional violations or that such consequences were so obvious the City's conduct can only be characterized as deliberate indifference." Pelzer, 656 F.Supp.2d at 533.

In Beck v. City of Pittsburgh, the plaintiff brought a Monell claim against Pittsburgh, alleging that the City had a "custom of excessive use of force by its police officers by permitting a situation to exist where police officers were not disciplined or subject to review for the use of excessive force against citizens." Beck, 89 F.3d at 971. The plaintiff claimed that a police officer, while effectuating a traffic stop, struck him in the face 6 to 8 times with a gun, forced him to the ground and kicked him in the ribs. The plaintiff filed a civilian complaint, which was corroborated by two companions, but the complaint was determined "unfounded." Id. at 968. The Third Circuit applied a deliberate indifference standard and highlighted several facts, which established a pattern of violations and the city's indifference to them. According to the Third Circuit, facts that the city was aware of regarding a pattern of excessive violence included: numerous prior excessive force complaints against the police officer; a prior report by the city which recognized that the police department had problems with excessive force and that the procedures in place were inadequate to respond to the problems; the city lacked a formalized reporting of use of force by officers; and the structure of the civilian complaint process curtailed disciplinary action. The court thus concluded that the plaintiff had presented sufficient evidence to allow a jury to determine that Pittsburgh policymakers knew and acquiesced to a custom of tolerating excessive force by police officers. Id. at 972-976.

In the instant case, Plaintiffs have only cited two facts to support their allegation that the City had a custom of condoning "unconstitutional, reckless and dangerous behavior by individual officers": the City's failure to initiate an independent investigation into the decedent's shooting and the City's alleged failure to implement a system to track the use of excessive force by officers. (Plaintiffs' Resp., p. 10).[7]

As to the investigation, "[one] case standing alone does not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983." Groman, 47 F.3d at 637; see Blakey v. City of Pittsburgh Police, 2010 WL 1254371, at *5 (W.D. Pa. Mar. 3, 2010) (stating that a failure to investigate may provide a means of establishing municipal liability, however the "law requires multiple prior instances of a failure to investigate before a municipality is deemed to have developed a policy or custom"). Therefore, any failures by the City in investigating this shooting alone does not support the custom suggested by Plaintiffs.

Further, the failure to track use of force, which Plaintiffs' expert stated "institutionalize[d] the lack of accountability for use of force incidents," is not sufficient to overcome Defendants' motion.[8] (Peters Report, p. 5). Plaintiffs have produced no evidence of a pattern of excessive force

---

[7] We note that Plaintiffs' expert report states that the City's civilian complaint process, which requires citizens to make a report directly to an officer's supervisor, forces citizens to jump through "artificial hoops" and protects officers from complaints. This fact, which Plaintiffs do not cite to in their response brief, does not establish a pattern of excessive force or that the City knowingly tolerated excessive force. Compare Beck, 89 F.3d at 974 (where Pittsburgh's civilian complaint review process was deficient because "[e]ven if complainant's witnesses were credible, their testimony became inert under [the review process], while at the same time police officers' statements appeared to have been given special, favorable consideration").

[8] There remains an issue of fact as to whether the City of Allentown has a formal policy for tracking use of force. Plaintiffs' expert, Dr. Peters, states that "[t]here has been nothing reviewed that indicates the City of Allentown, its City Council members, Mayor, and/or its Police Chief have a formal, documented, detection, monitoring, or surveillance system in place to identify those officers who use excessive force." (Peters Report, p. 5). Meanwhile, Defendants have produced the affidavit of David Howells, the Assistant Chief of Police for Allentown, who stated that the City uses computer software to monitor and track uses of excessive force by officers. (Howells Aff., ¶¶ 14-19). However, as stated above, even assuming that the City does not have a formal policy to track use of force, this

or that the City of Allentown was indifferent to such a pattern. In Beck, the plaintiff produced numerous civilian complaints against the police officer involved, which exhibited a pattern of excessive violence. The Beck plaintiff also produced a report issued by the city recognizing that excessive force was a problem. Here, Plaintiffs have not provided anything similar, and therefore, the Monell claim must be dismissed. See Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir. 1991) (holding that in order to establish the city's liability for an alleged custom of deliberate indifference to the serious medical needs of intoxicated and potentially suicidal detainees, plaintiff must show that the policymakers were aware of the number of suicides in city lockups and the alternatives to prevent them, "but either deliberately chose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction").

### G. The Estate's Assault and Battery Claim (Count XI)

Like the estate's excessive force claim, the estate's assault and battery claim shall proceed. "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). "A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such reasonable force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." Id.

Given the deposition testimony of Tonya Stewart, that box cutter flew across the room and

---

alone is not sufficient to establish municipal liability.

that the decedent was trying only to flee, there remains a genuine issue of material fact as to whether Moll acted reasonably in shooting the decedent. Thus, the estate's assault and battery claim against Moll shall proceed to trial.

To the extent that the complaint also raises an assault and battery claim against Wilcox, there has been no evidence presented to support such a claim. Therefore, the assault and battery claim against Wilcox shall be dismissed.

**H. Tonya Stewart's False Arrest and Illegal Imprisonment Claims (Count XII)**

Tonya Stewart's false arrest and imprisonment claims will also be dismissed. "[F]alse arrest and false imprisonment are essentially the same claim." Olender v. Twp. of Bensalem, 32 F.Supp.2d 775, 791 (E.D. Pa. 1999). False arrest is defined as (1) an arrest made without probable cause, or (2) an arrest made by a person without privilege to do so. McGriff v. Vidovich, 699 A.2d 797, 799 (Pa. Cmwlth Ct. 1997). False imprisonment is the (1) detention of another person, and (2) the unlawfulness of such detention. Renk, 641 A.2d at 293. As stated above, the officers had probable cause to arrest Tonya Stewart, therefore Plaintiffs' false arrest and false imprisonment claims must fail.

**I. Tonya Stewart and the Estate's Civil Conspiracy Claims (Count XIII)**

Plaintiffs' state law conspiracy claims will likewise be dismissed. A cause of action for civil conspiracy requires: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. Ct. 2004). As stated above, Plaintiffs have produced no evidence that Officers Moll and Wilcox acted with a common purpose to do an unlawful act. There are no facts of record that

implicate Wilcox in the actual shooting of the decedent or to suggest a "common purpose" with Moll. Plaintiffs, nonetheless, argue that the officers acted unlawfully after the shooting and cite to Tonya Stewart's deposition testimony where she stated that Wilcox moved the box cutter close to the decedent after the shooting. (Plaintiffs' Resp., p. 35). However, even assuming that Wilcox acted unlawfully by moving the knife, Plaintiffs have not pointed to any facts that he did so with Moll with a common unlawful purpose after the shooting. Therefore, Count XIII must be dismissed.

### J. Tonya Stewart and the Estate's Intentional Infliction of Emotional Distress Claims (Count XIV)

Plaintiffs' claims for intentional infliction of emotional distress shall also be dismissed. To prevail on an intentional infliction of emotional distress claim, "[t]here must be objective proof, with competent medical evidence." Hunger v. Grand Central Sanitation, 670 A.2d 173, 177 (Pa. Super. Ct. 1996). Here, Plaintiffs argue in their response that "[they] have listed Tonya Stewart's medical providers as witnesses, and her medical records as exhibits." (Plaintiffs' Resp., p. 36). However, Plaintiffs have failed to cite or attach any objective medical evidence substantiating her alleged emotional distress. Therefore, Count XIV must be dismissed.

### K. State Law Claims Against Moll and Wilcox in their Official Capacities

Moll and Wilcox, in their official capacities, are immune from any tort claims under the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"). The Tort Claims Act grants municipalities immunity from liability for any damages resulting from an injury to a person or property caused by an act of the municipality, its employee, or any other person, except in certain enumerated exceptions. 42 Pa. C.S. § 8542. These exceptions do not apply here, therefore all of Plaintiffs' state law claims against Moll and Wilcox, in their official capacities, must be dismissed.

## III. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Our Order follows.